**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.  2:02-CV-439 |
| | ) | |
| THE SMILE CENTER OF | ) | |
| FAMILY DENTISTRY, P.C. | ) | |
| MICHAEL a.k.a. "Chip" BAJZA, | ) | |
| MICHAEL EDDIE BAJZA and | ) | |
| MARGARET BAJZA | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF OPINION AND ORDER**

This matter is before the Court on a Motion to Compel/Rule to Show Cause [DE 68], filed by the Defendants Michael Bajza, D.D.S. and Smile Center Family Dentistry, P.C. ("Defendants") on December 27, 2004.  Based on the foregoing, the Court grants in part and denies in part the Motion to Compel.

**FACTUAL AND PROCEDURAL BACKGROUND**

This matter was filed by the Plaintiff, the United States of America, on October 31, 2002, alleging that the Defendants utilized specific billing codes in an improper manner to request payment from Medicaid for services rendered.  The Plaintiff has amended the Complaint on three occasions; the nature of the allegations have remained the same although the applicable billing codes have changed.  Neither the State of Indiana ("Indiana"), the Office of the Attorney General  for the State of Indiana, nor the Indiana Medicaid Fraud Control Unit ("IMFCU") are parties to this action.

On June 28, 2004, the Defendants issued non-party requests for production to the Indiana Attorney General and the IMFCU (collectively "Attorney General"). Responses to the requests for production were served on July 12, 2004, but no privilege log was provided with the responses.

On September 16, 2004, counsel for the Defendants sent correspondence addressing the responses and the absence of a privilege log. On October 18, 2004, the Attorney General responded. The Attorney General contended that the documents referred to in Requests 4 and 5 are maintained by Health Care Excel ("HCE") and have been provided to the Defendants by them, that the documents referred to in Requests 17 and 18 are maintained by the Indiana Family and Social Services Administration ("IFSSA") and have been provided to the Defendants by them, and that Requests 11, 12, 14 and 15 are vague and overly broad. Further, the Attorney General responded that, as a party representative, the Attorney General could assert the work product doctrine, and that Request 8 requested documents clearly covered by the work product doctrine. Finally, the Attorney General responded that, as to Request 7, the Attorney General was incorrect in his initial response and that he would be providing those documents not covered by a privilege as well as a privilege log. A privilege log was provided by the Attorney General on December 15, 2004, and documents were offered for inspection. On December 22, 2004, the Attorney General produced three boxes of documents for inspection, which included provider manuals seized from the Defendants, patient records submitted by the Defendants to HCE for prepayment review, computer spreadsheets summarizing individual claims made by the Smile Center for specific billing codes, and multiple copies of invoices from dental supply companies.

The Attorney General represents that during the Plaintiff's course of investigating and preparing this case, both before and after the case was filed, Indiana and the United States routinely

shared information, including privileged information, but that neither Indiana nor the United States shared the information with third parties without first consulting the other. On December 15, 2004, Indiana and the United States formalized their understanding by entering into a Confidentiality Agreement.

On December 27, 2004, the Defendants filed this Motion to Compel/Rule to Show Cause.[1] On February 7, 2005, Indiana and the United States filed a "Joint Memorandum of the State of Indiana and Plaintiff United States of America in Opposition to Defendants' Motion to Compel/Rule to Show Cause." The Defendants filed a Reply Brief on February 14, 2005.

## ANALYSIS

In the Motion to Compel/Rule to Show Cause, the Defendants move the Court pursuant to Rules 34(c) and 45 of the Federal Rules of Civil Procedure and Local Rule 37.1 for an order compelling the Office of the Attorney General of Indiana and the IMFCU to answer fully the Defendants' Non-Party Request for Documents that was initially served upon the Office of the Attorney General on June 28, 2004, and to make available for inspection and duplication all responsive documents. The Defendants argue that the Attorney General has provided incomplete responses and a late, incomplete, and nonconforming privilege log. The Court notes that the

---

[1] Although the Defendants have entitled the motion a Motion to Compel/Rule to Show Cause, in the motion, the Defendants have only requested that the Court enter an order compelling the Attorney General to answer fully the Defendants' Non-party Request for Documents and make available for inspection and duplication all responsive documents. Accordingly, the Court will treat this motion as a motion to compel.

Defendants do not specifically identify or comment on any of the individual requests for production or objections by the Attorney General.[2]

In response, the Attorney General argues that the non-party subpoena is unprecedented in scope and seeks, among other documents, (1) documents obtained during the course of, or which are the fruit of, a grand jury investigation, and which are not available to the attorneys in this civil case and are protected from disclosure by Federal Rule of Criminal Procedure 6(e)(2)(B); (2) documents constituting attorney-client communications between the Indiana Attorney General and his client agencies or their investigators; (3) documents describing the investigative strategy of those investigators; and (4) documents constituting communications between attorneys for the Attorney General and the United States discussing case preparation and litigation strategy.

The Attorney General argues that the privilege log describes "categories of documents in a manner designed to reveal unprivileged information about the documents without revealing privileged information that collectively would provide defendants with a road map regarding plaintiff's case preparation."  In addition, the Attorney General argues that, because Indiana pays approximately one third of all Medicaid reimbursements, both sovereigns, the State of Indiana and the United States, have a strong common interest as regulators and as the victims of alleged fraud in jointly prosecuting this civil case and, therefore, the common interest privilege governs the

---

[2] Based on the Defendants' arguments in its Motion to Compel, it appears that the motion does not address the responses to Requests for Production 1, 2, 3, 6, 9, 10, 13, 16 overall and to Requests for Production 11, 12, 14, 15, 17, and 18 to the extent they are objected to as overly broad.  The Defendants' motion appears to seek only those documents that may not be protected by the attorney-client privilege or the work product doctrine as asserted by the Attorney General in the privilege log in response to Request 7.  In addition, correspondence between the parties attached to the briefing represents that the documents requested in requests 4 and 5 are maintained by HCE and have been provided and that documents in requests 17 and 18 are maintained by IFSSA and have been provided.

sharing of privileged documents between Indiana and the United States and does not waive the privilege.

## A.   The Privileges

In this case, the Defendants issued a non-party subpoena to the Attorney General and requested a number of categories of documentation in their request for production.  When the Attorney General produced a privilege log the Defendants felt was inadequate, the Defendants filed the instant motion pursuant to Federal Rules of Civil Procedure 34(c) and 45.  The Defendants argue that the privilege log is inadequate because it lacks the specificity necessary for the Defendants to ascertain the applicability of the identified privilege.  More specifically, the Defendants argue that the privilege log groups multiple documents by multiple authors and to multiple recipients in large date ranges, which precludes any meaningful review by the Defendants or the Court.

Federal Rule of Civil Procedure 26(b)(1) provides that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party. . . .  For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).

Rule 34(c) provides: "A person not a party to the action may be compelled to produce documents and things or submit to an inspection as provided in Rule 45." Fed. R. Civ. P. 34(c). However, Rule 45(d)(2) provides: "When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications,

or things not produced that is sufficient to enable the demanding party to contest the claim."  Fed. R. Civ. P. 45(d)(2).

In its privilege log, the Attorney General asserts the attorney-client privilege or the work product doctrine as the reason for not producing certain documents in response to the Defendants' non-party subpoena.  The following is an example of the three entries on page 2 of the privilege log to demonstrate the structure used by the Attorney General:

| # of Pages | Document Description | Document Author | Date Range | Document Addressee(s) | Privilege Reason |
|---|---|---|---|---|---|
| 200 | Case preparation communications and research | Bill Anderson; Sandy Brown, EDS; Mike Carney, EDS; Terri Creekmore-Hughes, EDS; Donna Edwards, Shannon England; Sandra Hunt; Joni LaFata; Jeanne Lewer; Mark Trottman; Lin Bechtold, Investigator IMFCU; Tina Hampshire, Investigator IMFCU; Lisa Sweatland, Investigator IMFCU, Sandy Weston, Investigator IMFCU; Linda Vuletich, AA IMFCU | 5-21-01 to 9-22-04 | Bill Anderson; Sandy Brown, EDS; Mike Carney, EDS; Terri Creekmore-Hughes, EDS; Donna Edwards, Shannon England; Sandra Hunt; Joni LaFata; Jeanne Lewer; Mark Trottman; Lin Bechtold, Investigator IMFCU; Tina Hampshire, Investigator IMFCU; Lisa Sweatland, Investigator IMFCU, Sandy Weston, Investigator IMFCU; Linda Vuletich, AA IMFCU | WP |
| 15 | Communications to and from DAG, AUSA, and fraud investigators | Allen Pope, Director IMFCU; Don Baker, former Super. DAG; Cindy Crispin, former Super. DAG; Tam Vance, IT IMFCU; Tina Hampshire, Investigator IMFCU; Lisa Sweatland, Investigator IMFCU; Sandy Weston, Investigator IMFCU; Joe Reid, AUSA | 11-8-01 to 6-21-04 | Allen Pope, Director IMFCU; Don Baker, former Super. DAG; Cindy Crispin, former Super. DAG; Tam Vance, IT IMFCU; Tina Hampshire, Investigator IMFCU; Lisa Sweatland, Investigator IMFCU; Sandy Weston, Investigator IMFCU; Joe Reid, AUSA | ACC, WP |
| 117 | Communications to and from DAG and fraud investigators; fraud investigators' notes; case preparation documents | Molly Clark, HCE; Jeffrey Clearwater, HCE; Lisa Fornal, HCE; Diannah Levell, HCE; Mark McCarty, HCE; maria Mitchell HCE - SUR; Molly Terrell, SUR Supervisor, HCE; Angela Jackson, FSSA/OMPP;[3] Carol Gable, FSSA/OMPP; Jack Martin, Chief Legal Counsel IMFCU; Lisa Sweatland, Investigator IMFCU; Sandy Weston, Investigator IMFCU; Vicki Fletcher, AA IMFCU | 5-21-99 to 8-26-04 | Molly Clark, HCE; Jeffrey Clearwater, HCE; Lisa Fornal, HCE; Diannah Levell, HCE; Mark McCarty, HCE; maria Mitchell HCE - SUR; Molly Terrell, SUR Supervisor, HCE; Angela Jackson, FSSA/OMPP; Carol Gable, FSSA/OMPP; Patty Hebenstreit, former Director IMFCU; Jack Martin, Chief Legal Counsel IMFCU; Lisa Sweatland, Investigator IMFCU; Sandy Weston, Investigator IMFCU; Vicki Fletcher, AA IMFCU | ACC, WP |

As an initial matter, the documents requested by the Defendants appear relevant to this cause of action, and the Attorney General has not argued otherwise. To the extent that the documents contain information that might threaten the privacy of individuals unrelated to this litigation, the Attorney General could have sought a protective order; such an objection is not a basis for withholding documents. More broadly, the Attorney General has not filed a motion for protective

---

[3] The Office of Medicaid Policy and Planning ("OMPP").

order as to any of the documents included in this privilege log nor has the Attorney General submitted any documents for in-camera review in response to the Defendants' motion to compel. The Court now turns to the privileges.

1.  *Work Product Doctrine*

The work product doctrine protects documents and tangible things otherwise discoverable prepared by or for another party or by or for that other party's representative in anticipation of litigation or for trial. *See* Fed. R. Civ. P. 26(b)(3). The work product privilege is designed to protect materials prepared in "anticipation of litigation . . . ." *See id.*; *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947). Where a party has asserted the privilege, the "threshold determination . . . is whether the materials sought to be protected from disclosure were prepared in anticipation of litigation." *Binks Mfg. Co. v. National Presto Indus., Inc.*, 709 F.2d 1109, 1118 (7th Cir. 1983); *see also Allendale Mutual Ins. Co. v. Bull Data Sys., Inc.*, 145 F.R.D. 84, 87 (N.D. Ill. 1992). Consequently, if materials are produced in the ordinary and regular course of the discovery opponent's business, as opposed to in preparation for litigation, the materials are outside of the scope of the work product privilege. *See Allendale*, 145 F.R.D. at 87 (citing Fed. R. Civ. P. 26(b)(3), advisory committee notes). "The mere fact that litigation does eventually ensue does not by itself, cloak materials prepared by an attorney with the protection of the work product privilege; the privilege is not that broad." *Binks Mfg. Co.*, 709 F.2d at 1118. Rather, because "[p]rudent parties anticipate litigation and begin preparation prior to the time suit is formally commenced . . . the test should be whether, in light of the nature of the document and the factual situation in the particular case, the document

can fairly be said to have been prepared or obtained because of the prospect of litigation." *Id.* (quoting 8 Wright & Miller, Federal Practice & Procedure, Civil, Section 2024).

"A claim of privilege must be made on a statement-by-statement basis or document-by-document basis; a blanket claim of privilege is not acceptable." *Potts v. Allis-Chalmers Corp.*, 118 F.R.D. 597, 601 (N.D. Ind. 1987) (citing *United States v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983); *United States v. First State Bank*, 691 F.2d 332, 335 (7th Cir. 1982)); *see also In Re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000). The party seeking to assert the privilege has the "burden of proving that at the very least some articulable claim, likely to lead to litigation, [has] arisen." *Potts*, 118 F.R.D. at 601 (quoting *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 865 (D.C. Cir.1980)); *see also In Re Air Crash Disaster of Sioux City, Iowa*, 133 F.R.D. 515, 518 (N.D. Ill. 1990).

Neither party has presented any authority addressing the work product doctrine in the factual context of this matter, specifically where documents produced in the course of an investigation by the IMFCU and the Attorney General's office, that eventually leads to a cause of action brought by the United States, are sought by the Defendants in the federal cause of action who were the subjects of that IMFCU investigation. However, case law addressing the work product doctrine in the factual context of investigations in the insurance industry and of on-premise accident investigations by a business appear analogous to the facts before the Court in this matter.

In the insurance context, "[a]n investigation that is undertaken to determine whether there is coverage, whether the claim should be paid, and whether a subrogation claim could be pursued, is not undertaken in anticipation of litigation." *Nicklasch v. JLG Indus., Inc.*, 193 F.R.D. 568, 570 (S.D. Ind. 1999) (citing *Stout*, 150 F.R.D. 594, *aff'd*, 852 F. Supp. 704 (S.D. Ind. 1994); *Harper v.*

9

*Auto-Owners Ins. Co.*, 138 F.R.D. 655 (S.D. Ind. 1991); *American Ins. Co. v. Elgot Sales Corp.*, No. 97 CIV. 1327(RLC), 1998 WL 647206 (S.D.N.Y. Sept. 21, 1998)).  In the insurance context, "it is important to distinguish between an investigative report developed in the ordinary course of business as a precaution for the remote prospect of litigation and materials prepared because some articulable claim, *likely* to lead to litigation . . . has arisen." *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 977 (7th Cir. 1996) (citing *Binks*, 709 F.2d at 1120) (alteration in original) (internal quotation marks omitted).

Similarly, in the business context, "the mere contingency that litigation may result is not determinative.  If in connection with an accident or an event, a business entity in the ordinary course of business conducts an investigation for its own purposes, the resulting investigative report is produceable in civil pre-trial discovery." *See Binks*, 709 F.2d at 1119 (citing *Janicker v. George Washington Univ.*, 94 F.R.D. 648, 650 (D. D.C. 1982)).  "A more or less routine investigation of a possibly resistable claim is not sufficient to immunize an investigative report developed in the ordinary course of business." *Id.* (citing *Janicker*, 94 F.R.D. at 650).

In the context of this cause of action, IMFCU and other entities such as HCE, routinely monitor claims submitted for Medicaid reimbursement in order to detect and prevent fraud.  The Cooperation Agreement Between the Indiana Family and Social Services Administration, Office of Medicaid Policy and Planning and the Office of the Attorney General ("Cooperation Agreement") provides that the named offices comply with a number of provisions in order for the State of Indiana to receive federal funding for the establishment and operation of a Medicaid Fraud Control Unit. Based on the language in the Cooperation Agreement, the IFSSA has management responsibilities

of prevention, detection, and elimination of abusive and improper or fraudulent practices in the

Medicaid program.  The Cooperation Agreement further provides, in relevant part:

> The IFSSA agrees to:
> (1) Promptly refer to the Indiana Medicaid Fraud Control Unit hereinafter referred
> to as "IMFCU" of the OAG:
> (a) all cases of suspected fraud in the administration of the Medicaid program. . . .
> .
> (b) all cases of suspected fraud by providers of service under the Indiana Medicaid
> program.
> (c) all cases of the suspected misappropriation of patients' private funds in health
> care facilities receiving payments under the Indiana Medicaid program.
> (d) all cases of suspected patient abuse in health care facilities receiving payments
> under the Indiana Medicaid program.

Def. Br., Exh. I, p. 2.

Necessarily, the information gathered by IFSSA or its agents prior to and during the referral

to the IMFCU is gathered in the ordinary course of its responsibility to "prevent and detect fraud,"

and, therefore, the documents generated throughout that process are done so in the normal course

of the IFSSA's business.  Similarly, the "ordinary course" of the IMFCU's business appears to be,

in part, the investigation of certain providers to determine whether, in fact, violations are occurring,

and at the time the IMFCU receives the information and begins its investigation, the documents are

still being produced at the investigative stage when litigation is still a remote possibility and before

an articulable claim has arisen.  For example, in support of the Motion to Compel, the Defendants

have included a letter from the HCE Surveillance and Utilization Review Staff to the IMFCU dated

June 22, 1999, that identified a number of cases that may be of interest to the IMFCU and

recommend on-site or off-site reviews for those cases.  It seems clear that this type of document was

not produced in anticipation of litigation and should be produced to the Defendants.  However, the

document was produced by HCE in response to a non-party discovery request but it was not

11

included in the discovery produced by the Attorney General on December 15, 2004.  Nor is it clear whether this document was included in the privilege log as protected by the work product doctrine.[4]

Not all cases referred to the IMFCU ultimately result in litigation, and, therefore, until litigation is "anticipated" as defined under the work product doctrine, many of the documents prepared by the IFSSA, by separate entities working for IFSSA, or by the IMFCU may be prepared in the ordinary course of the business of determining whether or not violations of the Medicaid regulations are occurring.  Therefore, there must be a point in time at which the Attorney General, based on the information provided by the IMFCU, determines that litigation would be likely.  It is from that date forward that certain otherwise-qualified documents may be considered to be prepared in "anticipation of litigation."

In this case, at some point in time the Attorney General made a determination to refer the Defendants' reimbursement practices to the United States Attorney, and that is the time at which documents could begin to be labeled as having been produced in anticipation of litigation.  Notably, the Attorney General has provided no factual support for the claims of privilege as to the individual documents or categories of documents made in the privilege log, nor has the Attorney General made any argument or presented any case law in support of many of its claims of privilege, as is its burden.     It is unclear from the privilege log provided by the Attorney General or from the joint response brief at what point in time the litigation against the Defendants was anticipated or even when the case was referred to the United States Attorney by the Attorney General.  Many of the

---

[4] For example, the third entry on page 2 of the privilege log, as reproduced above, includes at least one document authored by an HCE-SUR employee after May 21, 1999, that could have potentially been addressed to an employee of IMFCU.  However, because of the way the documents are grouped in the privilege log, it is impossible for the Court to determine if the June 22, 1999 letter was identified as a privileged document in the log by the Attorney General.

entries on the privilege log are documents written by IMFCU investigators, IMFCU directors, or Deputy Attorney General ("DAG") supervisors and are written to IMFCU investigators, IMFCU directors, or DAG supervisors, but it is not clear which authors wrote to which addressees. A closer look at some of the documents may reveal that IMFCU investigators were writing to IMFCU directors regarding the investigation of the Defendants but not in anticipation of litigation within the meaning of the work product doctrine. If certain documents were written by an investigator to another investigator during the early stages of the investigation, the Attorney General has not shown how these documents are protected by the work product doctrine.

In addition, the date ranges provided in some categories span time periods long before the institution of this civil action, which leads the Court to believe that many of those documents were produced in the ordinary course of the business of the IFSSA and the IMFCU and prior to the anticipation of litigation. However, the closer the date of a document gets to the period when the Defendants' case was referred to the United States Attorney, the more likely that document is to be covered by the work product doctrine.

Nor is it clear *why* the documents are grouped together as they are. Document descriptions as well as authors and addressees reappear in multiple entries in various groupings for a variety of time periods, without explanation as to the repetition or the grouping. Also, documents in a single entry are as diverse as "communications to and from DAG and fraud investigators" and "fraud investigators' notes," again with diverse date ranges, and with privileges of both attorney-client privilege and work product doctrine.

Another problem is that some of the document descriptions have titles such as "Fraud investigators communications, notes, and analysis," "Fraud investigators' background research and

13

communications," or "IMFCU analysis of Smile Center submissions," which, by their titles, appear to have been produced during the investigation into the Defendants' Medicaid billing practices. Also, some of the date ranges for entries that list "fraud investigators' notes" date as far back as May 21, 1999, and some of these entries have unknown dates.  This type of document seems to fall within the category of documents produced in the ordinary course of business of the IMFCU and before litigation is anticipated, yet the Attorney General has not demonstrated or even argued why such documents are protected by the work product doctrine.

Admittedly, other entries appear to qualify for the protection contemplated by the work product doctrine.  Entries with titles such as "Communications to and from DAG and Investigators" during the period after the cause of action was filed may be covered by the work product doctrine or the attorney-client privilege if the other elements of the privileges are met.  However, the fact that a document is produced after litigation has been initiated does not, by itself, protect the document from discovery if the document was not produced for the purposes of the litigation.  For other categories such as "legal research," the work product doctrine also likely applies.

The categories "case preparation documents" and "case preparation communications and research" are problematic because it is not clear whether "case" refers to this litigation filed in federal court or to the investigation being conducted by the IMFCU that ultimately led to the filing of this "case."  Documents produced in the former are more likely to fall within the work product doctrine whereas documents produced in the latter may or may not qualify depending on the stage at which they were produced in the investigation.

Having reviewed the privilege log and without any specific argument or explanation from the Attorney General as to the nature of the individual documents included in the log, the Court is

14

unable to determine whether documents that have been included in the privilege log should have been produced to the Defendants based on this analysis of the work product doctrine.  This cause of action brought by the United States includes allegations of fraud, a claim that must be plead with specificity.  Any information relating to the facts obtained by the Attorney General during its investigation that may either support or refute the Plaintiff's claims are relevant to this cause of action, and these facts, in and of themselves, are not protected by the work product doctrine. Similarly, any communications between the Attorney General or the IMFCU and the OMPP or the IFSSA and its contractors regarding Medicaid policy is also relevant and essential to the Defendants' defense of the claims for the Defendants to understand how the claims the Defendants made were false or misleading, what Medicaid authority determined that they were false or misleading, what standards were used, who was mislead, and when they were mislead.

The Defendants also argue that, because the Plaintiff's prior knowledge is a defense to the False Claims Act and unjust enrichment and because in this type of case contributory negligence is an absolute bar to a claim for negligence, the Defendants must be able to determine precisely when the Plaintiff received notice of the Defendants' billing practices and why the Indiana Medicaid program continued to pay for billing practices it may have questioned; therefore, the Defendants argue that any and all documents that indicate the knowledge of any agents of Indiana Medicaid are essential to the defense and are discoverable.

Therefore, the Court orders the Attorney General to provide to the Defendants all documents currently contained in the privilege log for which the work product privilege was originally asserted and to which no other privilege applies that the Attorney General determines, based on this Order, are not protected by the work product doctrine:

15

(1)  For those documents clearly prepared prior to the anticipation of litigation, those documents prepared after the litigation was commenced but that were not prepared for the litigation, or those documents provided to third parties,[5] the Attorney General shall turn those documents over to the Defendants directly without prior review by the Court.

(2) For those documents dated close to the date the Attorney General determines that ligation was anticipated, if the Attorney General is unsure whether such individual documents are covered by the work product doctrine, the Attorney General shall provide those documents along with a privilege log to the Court for in-camera review.  Having set forth the legal standards as well as numerous examples of documents within the privilege log, the Court entrusts the Attorney General with the task of determining at what point litigation against the Defendants was "anticipated."

(3) For all remaining documents the Attorney General unquestionably believes to be covered by the work product doctrine, the Attorney General shall provide a privilege log to the Defendants. The privilege log shall be constructed in such a way as to cure the deficiencies identified in this Order– generally, the mixing of types, dates, authors, and addressees of documents such that a determination of privilege cannot be made.  The Court is cognizant of the Attorney General's concern of providing so much information in the privilege log that the sequence of events itself is privileged and should not be disclosed.  However, the Court must balance this concern against the Defendants' right to discovery regarding the IMFCU's investigation into the Defendants' dental billing practices and the Defendants' right to all other non-privileged relevant discovery reasonably calculated to lead to the discovery of admissible evidence.  For this reason, the Attorney General

---

[5] As set forth in Part A.3 below, the Court finds that the common interest privilege applies and the sharing of documents otherwise protected by the work product doctrine by the Attorney General and the United States Attorney does not constitute a waiver of the work product doctrine.

may craft the privilege log in a way that does not disclose the order or sequence of communications that may be privileged but that nevertheless meets the requirements of Rule 45(d)(2).  For example, it may be possible for the Attorney General to utilize date ranges for certain types of documents as long as the documents included in each entry are limited to a narrower and more specific grouping than currently provided in the December 15, 2004 privilege log.  From the new privilege log, both the Defendants and the Court should be able to evaluate whether documents are covered by the work product doctrine.

### 2.  Attorney-client Privilege

The Court next turns to the attorney-client privilege.  "The attorney-client privilege protects from disclosure confidential communications made by a client to his attorney."  *In re Walsh*, 623 F.2d 489, 492 (7th Cir. 1980).  The attorney-client privilege only applies to confidential communications made when legal advice is sought from an attorney acting in the capacity as a professional legal advisor.  *See Rehling v. City of Chicago*, 207 F.3d 1009, 1019 (7th Cir. 2000); *see also United States v. Evans*, 113 F.3d 1457, 1463 (7th Cir. 1997) (privilege extends only to conversations where attorney is acting to provide legal advice).

"[T]he privilege protects confidential communications, not the attorney-client relationship as a whole."  *In re Walsh*, 623 F.2d at 493.  "For example, the fact of communication between a known client and his attorney is not a privileged communication."  *Id*. at 494.  "The privilege does not foreclose inquiry into the fact of representation itself or the dates upon which services are rendered as long as the substance of the attorney-client relationship is shielded from disclosure."  *Condon v. Petacque*, 90 F.R.D. 53, 54 (N.D. Ill. 1981).

17

The attorney-client privilege is "'one of the oldest recognized privileges for confidential communications'" known to the common law. *United States v. BDO Seidman*, 337 F.3d 802, 810 (7th Cir. 2003) (citing *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998)). The purpose of the attorney-client privilege is to encourage full disclosure and to facilitate open communication between attorneys and their clients. *Id.* (citing *Swidler*, 524 U.S. at 403). Because "'the privilege has the effect of withholding relevant information,'" courts construe the privilege to apply only where necessary to achieve its purpose. *Id.* (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976); citing *In re Grand Jury Proceeding*, 898 F.2d 565, 567 (7th Cir. 1990)). "The mere assertion of a privilege is not enough; instead, a party that seeks to invoke the attorney-client privilege has the burden of establishing all of its essential elements." *Id.* (citing *In re Grand Jury Proceedings*, 220 F.3d at 571; *United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997)).

In this case, the client is neither an individual nor a corporation. Rather, it appears that the Attorney General is asserting that the client is the State of Indiana, through the IMFCU, the IFSSA, or the OMPP, and that the attorney is the Attorney General of the State of Indiana. However, the case law supports that the "government is entitled to the same attorney-client privilege as any other client." *In re Witness Before Special Grand Jury 2000-2*, 288 F.3d 289, 291 (7th Cir. 2002) (citing *Green v. IRS*, 556 F. Supp. 79, 85 (N.D. Ind.1982) (privilege "unquestionably" applies to conversations between government lawyers and administrative personnel), *aff'd*, 734 F.2d 18 (7th Cir.1984); Restatement (Third) of Law Governing Lawyers § 74 (2000) ("[T]he attorney-client privilege extends to a communication of a governmental organization.")).

As with the work product privilege, because the privilege log groups documents together, the Court is unable to determine on a document-by-document basis whether the minimum

requirements of the attorney-client privilege have been met–namely that the communication was between the client, the IMFCU, and its attorney, the Attorney General.  More importantly, the Court cannot determine if the communications were made for the purpose of seeking legal advice from the Office of the Attorney General in its capacity as a legal advisor, and the Attorney General has not met its burden of establishing this aspect of the privilege.

For example, entries with titles such as "communications to and from DAG and fraud investigators; fraud investigators' notes; case preparation documents" assert the privileges of attorney-client communication and work product doctrine and cover documents authored by individuals from HCE, HCE-SUR, and IFSSA/OMPP and from the Chief Legal Counsel IMFCU and IMFCU investigators and sent to individuals from HCE, HCE-SUR, and IFSSA/OMPP, to the Chief Legal Counsel of IMFCU, and to IMFCU investigators.  Def. Br., Exh. E, p. 2 (Attorney General's Privilege Log).  Because so many documents are grouped together, it is impossible to determine which documents may be covered by which privilege.  Clearly, only those documents sent by or to legal counsel might possibly be covered by the attorney-client privilege, assuming they meet the other criteria of the privilege.  However, documents that may have been sent from HCE to the IMFCU do not appear to be covered by the attorney-client privilege or may not be covered by the work product doctrine if they were prepared in the investigative stages of the process, as would be possible as the date range for the entry was May 21, 1999 to August 26, 2004.

Other entries list only one description that is more likely to include documents covered by the attorney-client privilege.  Some of these entries have single descriptions such as "communications to and from DAG, AUSA, and fraud investigators" or "communications to and from DAG and fraud investigators."  If the written communications were in fact between the client

19

and the attorney, then that element of the  attorney-client privilege would be met.  However, communications between the Deputy Attorney General and the Assistant United States Attorney would not be covered by that privilege, although they may be covered by the work product privilege.

Accordingly, the Court orders:

(1) that the Attorney General review the documents in the privilege log for which the attorney-client privilege is asserted and that the Attorney General turn over to the Defendants directly any documents not covered by the attorney-client privilege as set forth in this Order (not otherwise privileged); and

(2) that for all remaining documents for which the Attorney General asserts the attorney-client privilege, the Attorney General provide the Defendants with a modified privilege log that will allow the Defendants the equivalent of a document-by-document review of the asserted privilege. The Court is cognizant of the fact that the sequence of communications between an attorney and client may be protected by the work product doctrine, even if the fact of the communication between the attorney and the client is not covered by the attorney-client privilege.  Therefore, the privilege log may again group documents for the purposes of the attorney-client privilege only to the extent that each document in the entry has the same document author and document addressee(s) and the same document description; however, a date range may be utilized for each entry rather than an individualized listing of the date for each document within that entry.

*3. Common Interest Privilege*

Finally, the Court finds that the common interest privilege protects the Attorney General from having waived the protections of the work product doctrine or the attorney-client privilege when it shared documents or information with the United States Attorney in order for the United States to file this civil cause of action.  *See, e.g.*, *Castle v. Sangamo Weston, Inc.*, 744 F.2d 1464, 1466-67 (11th Cir. 1984) (citing *Railroad Salvage v. Japan Freight Consolidators*, 97 F.R.D. 37, 39 (E.D.N.Y.1983) (documents prepared by party's in-house counsel in anticipation of litigation retain their status as work product when delivered to party's trial counsel)); *In re Crazy Eddie Sec. Litig.*, 131 F.R.D. 374, 379 (E.D.N.Y. 1990); *In re Sunrise Sec. Litig.*, 130 F.R.d. 560, 583 (E.D. Pa. 1989); *Duplan Corp. v. Deering Milliken, Inc.,* 397 F. Supp. 1146, 1174-75 (D. S.C. 1974).

Although Indiana is not a party to this litigation, the Complaint does not seek recovery of sums reimbursed by the State of Indiana to the Defendants, and it does not appear that the Attorney General has filed a separate cause of action on behalf of Indiana, nevertheless, the Attorney General and the United States have a joint interest or purpose in the prosecution of the civil claims for fraud under federal law in this case.  Under Title XIX of the Social Security Act, a state plan for the Medical Assistance Program was entered into by the Attorney General of Indiana.  *See* Def. Br., Exh. H.  On December 2, 1991, the Attorney General of Indiana certified that the Office of Medicaid Policy and Planning will be the single state agency responsible for administering the plan.  *See id*. The preamble to the Cooperation Agreement between the IFSSA, the OMPP, and the Office of the Attorney General provides:

> WHEREAS, Public Law 95-142, 91 Stat. 1175, was enacted by the U.S. Congress on October 25, 1977, to strenghten the capability of the government to detect, prosecute, and punish fraudulent activities under the Medicare and Medicaid programs; and

21

> WHEREAS, Section 17 of P.L. 95-142 authorized by the Secretary of the U.S. Department of Health and Human Services to certify a state Medicaid Fraud Control Unit for which the federal government will fund 90 percent of the costs for establishment and operation thereof up to a maximum specified in the law; and
>
> WHEREAS, P.L. 95-142 requires that a state Medicaid Fraud Control Unit must be an entity separate and distinct from the single state agency that administers or supervises the administration of the state Medicaid program; and
>
> WHEREAS, pursuant to the requirements of P.L. 95-142, the Secretary of the U.S. Department of Health and Human Services has promulgated regulations (42 CFR, sec. 1007.9 (1992 ed.) pertaining to the establishment of state Medicaid Fraud Control Unties which require that an entity applying for certification as a Medicaid Fraud Control Unit must have an agreement with the single state agency administering the Medicaid program whereby both agencies agree to the conditions established in paragraph (d) of section 1007.9 (1992 ed.) above.

Def. Br., Exh. I.  The Agreement then goes on to set forth the reporting requirements of the IFFSA to the IMFCU, a division of the Office of the Attorney General, for instances of suspected fraud.

Based on this document, the work of the IMFCU is essentially funded by the United States Government for the purpose of detecting, prosecuting, and punishing fraudulent activities under the federal Medicare and Medicaid programs.  In other words, the United States would be hard pressed to bring this type of civil action without the work done for it by state entities such as the IMFCU. In this limited context, the relationship between the Attorney General and the United States Attorney could be analogized to that of communications between in-house counsel for a corporation and that corporation's trial counsel.  *See Castle*, 744 F.2d at 1467 (citing *Railroad Salvage*, 97 F.R.D. at 39). In addition, the Attorney General and the United States Attorney have represented that they shared information to further the purpose of developing this civil case and of preparing for trial, that neither revealed any of the documents on the privilege log to third parties, and that they maintained the confidentiality of the information shared.[6]  Accordingly, the Court finds that, in this case, the sharing

---

[6] In support of the common interest privilege, the Attorney General asserts the "Confidentiality Agreement" entered into by the Attorney General and the United States on December 15, 2004, the same day that the privilege log was provided to the Defendants.  The Agreement appears to have been created as a response to the Defendants' Motion

of information between the Attorney General and the United States Attorney does not constitute a waiver of the work product doctrine or the attorney-client privilege.

## B.  The Criminal Investigation and the Grand Jury Proceedings

The Attorney General also argues that documents obtained during the course of, or which are the fruit of, a grand jury investigation, and which are not available to the attorneys in this civil case are protected from disclosure by Federal Rule of Criminal Procedure 6(e)(2)(B).

The United States opened a parallel criminal investigation of some of the factual issues involved in this civil case, and a grand jury investigation resulted in an indictment of Michael Bajza, Michael Eddie Bajza, and Margaret Bajza on June 19, 2003.  The grand jury returned a superseding indictment on these defendants on January 21, 2004.  The criminal investigation was assigned to a different Assistant United States Attorney than the one assigned to this civil cause of action, who independently conducted or supervised the criminal investigation and grand jury investigation and has retained custody of all documents generated pursuant to that investigation.  The United States represents that the Assistant United States Attorney in this civil matter does not have access to the documents obtained or generated during the grand jury investigation.

Federal Rule of Criminal Procedure 6(e)(2)(B) provides that an attorney for the government or an individual to whom a disclosure has been made pursuant to enumerated exceptions must not disclose a matter occurring before the grand jury.  Accordingly, government attorneys pursuing a civil claim for the United States may not obtain access to matters occurring before a grand jury

---

to Compel rather than as a proactive measure at the institution of this cause of action.  Nevertheless, the Court considers the document to the extent that it memorializes the ongoing understanding between the State of Indiana and the United States regarding the sharing of privileged information related to this cause of action.

unless ordered by a court based on a showing of "particularized need" pursuant to Rule 6(e). *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 431 (1983); *United States v. Baggot*, 463 U.S. 476, 479-80 (1983).

To the extent that the Requests for Production seek information protected by Rule 6(e), the Court denies the Motion to Compel as to those materials.  However, it appears that the United States has had access in this civil matter to other documents obtained in the parallel criminal matter, outside the grand jury proceedings, and has utilized those documents in this civil matter.[7]  To the extent that the Attorney General or the IMFCU is in possession, as a result of this civil action, of any documents *relevant* to this civil action, that were obtained during the criminal investigation, but not during the grand jury proceedings, those documents are discoverable.  The Attorney General is under no obligation to provide documents produced or obtained in the course of the criminal investigation that are not relevant to this civil matter, nor is the Attorney General required to provide a privilege log for documents in the criminal case that are not relevant to this civil matter.

---

[7] Based on the deposition transcript, the Assistant United States Attorney in this civil matter appears to have utilized such documents in the course of the deposition of Dr. Bajza.

**CONCLUSION**

Accordingly, the Court **GRANTS in part** and **DENIES in part** the Motion to Compel/Rule to Show Cause [DE 68].  The Court **GRANTS** the Defendants' request that the Attorney General produce for inspection all documents included in the privilege log that are not protected by the work product doctrine or the attorney-client privilege as set forth in this Order.  The Court **DENIES without prejudice** the Defendants' request to depose certain IMFCU personnel.  The Court **ORDERS** that, on or before **May 31, 2005**, the Attorney General, (1) **SHALL PRODUCE** to the Defendants all non-privileged documents included in the December 15, 2004 privilege log *in accordance with this Order* and (2) **SHALL SUBMIT** any documents to the Court for in-camera inspection *in accordance with this Order*.

So ORDERED this 14th day of April, 2005.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc: All counsel of record

25